IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-147

No. 216A20

Filed 17 December 2021

JAMES CUMMINGS and wife, CONNIE CUMMINGS

v.

ROBERT PATTON CARROLL; DHR SALES CORP. d/b/a RE/MAX COMMUNITY BROKERS; DAVID H. ROOS; MARGARET N. SINGER; BERKELEY INVESTORS, LLC; KIM BERKELEY T. DURHAM; GEORGE C. BELL; THORNLEY HOLDINGS, LLC; BROOKE ELIZABETH RUDD-GAGLIE f/k/a BROOK ELIZABETH RUDD; MARGARET RUDD & ASSOCIATES, INC.; and JAMES C. GOODMAN

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 270 N.C. App. 204 (2020), affirming, in part, and reversing and remanding, in part, an order entered on 31 July 2018 by Judge Alma L. Hinton in Superior Court, Brunswick County, granting summary judgment in favor of defendants Robert Patton Carroll; DHR Sales Corp. d/b/a Re/Max Community Brokers; Berkeley Investors, LLC; George C. Bell; Brooke Elizabeth Rudd-Gaglie f/k/a Brooke Elizabeth Rudd; Margaret Rudd & Associates, Inc.; and James C. Goodman. On 15 December 2020, the Supreme Court allowed defendants Berkeley Investors' and Mr. Bell's petition for discretionary review as to additional issues. Heard in the Supreme Court on 30 August 2021.

*Chleborowicz Law Firm, PLLC, by Christopher A. Chleborowicz and Elijah A.T. Huston, for plaintiff-appellees.*

*Wallace, Morris, Barwick, Landis & Stroud, P.A., by Stuart Stroud and Kimberly Connor Benton for defendants-appellants Brooke Elizabeth Rudd-Gaglie f/k/a Brooke Elizabeth Rudd; Margaret Rudd & Associates, Inc.; and James C. Goodman.*

*Alexander C. Dale and Ryal W. Tayloe for defendants-appellants George C. Bell and Berkeley Investors, LLC.*

*Crossley McIntosh Collier Hanley & Edes, PLLC, by Clay Allen Collier, for defendants-appellants Robert Patton Carroll and DHR Sales Corp. d/b/a Re/Max Community Brokers.*

ERVIN, Justice.

This case stems from a dispute surrounding the purchase of an oceanfront beach house located on Oak Island by plaintiffs James Cummings and his wife, Connie Cummings. Several months after closing, plaintiffs discovered the existence of significant structural damage to the house arising from past water intrusion, prompting them to assert claims against defendants for negligence, negligent misrepresentation, fraud, unfair and deceptive trade practices, breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty. After the conclusion of discovery, the trial court granted defendants' motions for summary judgment. On appeal, we have been asked to determine if the trial court correctly granted summary judgment with respect to the claims of negligence and fraud against Re/Max and Mr. Carroll, negligent misrepresentation and fraud against Berkeley Investors and Mr. Bell, and breach of fiduciary duty against Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman. After careful consideration of the

record in light of the applicable law, we affirm the decision of the Court of Appeals, in part; reverse the decision of the Court of Appeals, in part; and remand this case to Superior Court, Brunswick County, for a trial on the merits with respect to these claims.

## I.    Factual Background

### A. Substantive Facts

On 15 August 2014, plaintiffs purchased an oceanfront beach house located on Oak Island from Berkeley Investors.  Plaintiffs were represented in connection with the transaction by Rudd & Associates, acting through Ms. Rudd-Gaglie and Mr. Goodman.  On the other hand, Berkeley Investors was represented by Re/Max, with Mr. Carroll serving as the listing agent.  At all times relevant to this case, Mr. Bell and defendant Thornley Holdings, LLC, which is an entity owned by defendant Kim Durham, each owned a fifty-percent interest in Berkeley Investors.

Berkeley Investors had purchased the house, which had been built in 2003, for use as a short-term rental property.[1]  Berkeley Investors retained Oak Island Accommodations, Inc., for the purpose of renting, cleaning, and otherwise maintaining the property.  According to maintenance records maintained by Oak Island Accommodations, the house had experienced numerous maintenance-related

---

[1] The house is elevated above the ground level by pilings, with the second floor, which is used as a guest area, containing a living room and two bedrooms, while the third floor, which constitutes the main level, contains a central living area, a kitchen and dining area, and a master bedroom.

problems from 2005 through 2014, including water damage to the ceiling, a number of internal water leaks, and mold growth.

¶ 4 On 2 January 2013, Berkeley Investors hired Mr. Carroll for the purpose of listing the house for sale. Subsequently, on 20 January 2013, Berkeley Investors executed a State of North Carolina Residential Property and Owners' Association Disclosure Statement, which residential property owners are required to provide to prospective buyers in accordance with N.C.G.S. § 47E-4. Mr. Bell and Ms. Durham, who completed the form on behalf of Berkeley Investors, answered the following questions in the negative:

> Regarding the [house] . . . to your knowledge is there any problem (malfunction or defect) with any of the following:
>
> . . . .
>
> 1. FOUNDATION, SLAB, FIREPLACES/CHIMNEYS, FLOORS, WINDOWS (INCLUDING STORM WINDOWS AND SCREENS), DOORS, CEILINGS, INTERIOR AND EXTERIOR WALLS, ATTACHED GARAGE, PATIO, DECK OR OTHER STRUCTURAL COMPONENTS including any modifications to them?
>
> 2. ROOF (leakage or other problem)?
>
> 3. WATER SEEPAGE, LEAKAGE, DAMPNESS OR STANDING WATER in the basement, crawl space or slab?
>
> . . . .
>
> 10. PRESENT INFESTATION, OR DAMAGE FROM PAST INFESTATION OF WOOD DESTROYING INSECTS OR ORGANISMS which has not been repaired?

According to the disclosure statement, if "something happens to the property to make your [d]isclosure [s]tatement incorrect or inaccurate (for example, the roof begins to leak), [the sellers] must promptly give the purchaser a corrected [d]isclosure [s]tatement or correct the problem."

Mr. Bell and Ms. Durham knew of and had discussed problems relating to water intrusion into the house as early as January 2011, with Mr. Carroll having been included in these discussions as early as 14 October 2013, following his engagement as the listing agent. For example, in a 14 October 2013 e-mail to Ms. Durham and Mr. Carroll, Mr. Bell stated that the owners needed to "trace the source of the water leakage evident on the ceiling" of the guest room and "[f]ix the separated/rotted wood in the guest room level from the water leakage." In addition, Mr. Bell noted that he had "[f]ound a small plumbing leak in the kitchen" that he had "fixed with tape."

On 20 January 2014, Mr. Bell sent an e-mail to Ms. Durham that contained a list of repairs that needed to be made to the house and in which he noted that:

> [t]here has been a lot of water-intrusion that has come into [the guest-level] ceiling from wind driven rain from above and has stained it badly about 15 feet into the room ceiling. It's right in the center of the room and seems to originate on the upper level and flow down through the interior column between the doors.

Mr. Bell recommended that the owners "[f]ind and repair the source of this leak that is causing the damage. We'll need to get a few boards replaced on the columns as

well; they are buckled from the water-intrusion." In addition, Mr. Bell suggested that the owners paint the wooden trim around the doors leading to the lower deck because it was "in real danger of beginning to rot." Although records obtained from Oak Island Accommodations dated 13 February 2014 indicate that it was seeking estimates relating to the cost of the work needed to repair these problems, an entry in its records dated 25 March 2014 notes that "[o]wner is having this work completed by another vendor."

¶ 7        In March 2014, Mr. Carroll enlisted the services of Randy Cribb, a painter who had performed painting work on the house during the preceding year. In addition to painting the living room walls and ceiling, an exterior wall, and the upper and lower decks, Mr. Cribb agreed to repair "cracks" and "cracked caulk" in the ceiling. At some time prior to 24 March 2014, Mr. Cribb sent a text message to Mr. Carroll in which he stated that he was almost finished with the work that he had been engaged to perform, that he "may have found that leak," and that he "hope[d] that was it." On the other hand, Mr. Cribb's deposition testimony indicated that he had not looked behind the walls for the purpose of determining whether any water intrusion had occurred.

¶ 8        In April 2014, plaintiffs contacted Ms. Rudd-Gaglie, with whom they had worked in the past, for the purpose of assisting them in exploring the option of purchasing the house. As a result, Ms. Rudd-Gaglie contacted Mr. Carroll and

arranged for an initial site visit, which she attended with plaintiffs. On 26 June 2014, plaintiffs employed Rudd & Associates to represent them in connection with the purchase of the house by executing an Exclusive Buyer Agency Agreement which provided, among other things, that (1) Rudd & Associates had a duty to "disclos[e] to [plaintiffs] all material facts related to the property or concerning the transaction of which [Rudd & Associates] has actual knowledge" and would "exercise ordinary care, comply with all applicable laws and regulations, and treat all prospective sellers honestly" in the process; (2) plaintiffs were "advised to seek other professional advice in matters of . . . wood-destroying insect infestation, structural soundness, engineering, and other matters pertaining to any proposed transaction"; and (3), although Rudd & Associates "may provide [plaintiffs] the names of providers who claim to perform such services, [plaintiffs] understand[ ] that [it] cannot guarantee the quality of service or level of expertise of any such provider." The buyer agency agreement also specified that plaintiffs "agree[d] to indemnify and hold [Rudd & Associates] harmless" for any liability arising "either as a result of [plaintiffs'] selection and use of any such provider or [plaintiffs'] election not to have one or more of such services performed."

¶ 9        On 12 July 2014, plaintiffs made an offer to purchase the house for $1.25 million, which was accepted on behalf of Berkeley Investors by Mr. Bell on 12 July 2014 and by Ms. Durham on 13 July 2014. The Offer to Purchase and Contract

between plaintiffs and Berkeley Investors included a 30-day due diligence period, during which plaintiffs or their agents were entitled to "conduct all desired tests, surveys, appraisals, investigations, examinations and inspections of the Property as [plaintiffs'] deem[ ] appropriate" and specifically provided for the performance of inspections "to determine . . . the presence of unusual drainage conditions or evidence of excessive moisture adversely affecting any improvements on the Property" or "evidence of wood-destroying insects or damage therefrom." After noting that plaintiffs acknowledged having received and reviewed the disclosure statement, the purchase contract provided that "THE PROPERTY IS BEING SOLD IN ITS CURRENT CONDITION" and that Berkeley Investors had not extended any warranty to plaintiffs in connection with the sale.

¶ 10 Ms. Rudd-Gaglie recommended that plaintiffs employ Jeff Williams, a licensed home inspector, to inspect the house. On 19 July 2014, Mr. Williams conducted his inspection, with Mr. Cummings, Mr. Carroll, Ms. Rudd-Gaglie, and Mr. Goodman, who was the broker-in-charge at Rudd & Associates, in attendance. Mr. Cummings testified during his deposition that, after the conclusion of the inspection, he asked Mr. Carroll if the house was "a good, watertight, sound house?" and that Mr. Carroll had responded by stating that, "if [he] had the money, [he would] buy it."

¶ 11 In the detailed report that he prepared for Ms. Rudd-Gaglie following the completion of the inspection, Mr. Williams outlined the scope of the work that he had

performed by indicating that he would, among other things, (1) "[r]eport signs of abnormal or harmful water penetration into the building or signs of abnormal or harmful condensation on building components" and (2) "[p]robe structural components where deterioration is suspected." On the other hand, the report stated that Mr. Williams would not "[e]nter any area or perform any procedure that may damage the property or its components" and that he would not be required to "[m]ove personal items, panels, furniture, equipment, plant life, soil, snow, ice or debris that obstructs access or visibility" or "inspect[ ] behind furniture, area rugs or areas obstructed from view." At the end of each section, the report stated that, "[w]hile the inspector makes every effort to find all areas of concern, some areas can go unnoticed" and that "[i]t is recommended that qualified contractors be used in your further inspection or repair issues as it relates to the comments in this inspection report." In addition, Section 1 of the report, which addressed issues relating to "Roofing," specifically noted that "[o]ur inspection makes an attempt to find a leak but sometimes cannot."

¶ 12    In the more structure-specific portions of his report, Mr. Williams noted the existence of numerous problems with the house that needed to be repaired, including: (1) the presence of minor damage to the roof; (2) the need for portions of the exterior walls "to be sealed to keep water and insect[s] from entering the home"; (3) the presence of certain doors that would not close or seal properly; (4) the difficulty of

opening certain sliding doors and windows and the presence of rust stains on some of those fixtures; and (5) the presence of loose drywall tape near the guest-level entryway, a condition that Mr. Williams attributed to a "lack of air movement" and that led him to recommended the installation of a dehumidifier "to remove moisture." On the other hand, nothing in Mr. Williams' report suggested that the house had experienced significant water intrusion. In his deposition, Mr. Williams testified that he had not seen any evidence of water intrusion; that, if he had, he "most definitely" would have conducted a moisture test by using an awl to probe the wall and identify spots in which the drywall had been softened by moisture; that no one had made him aware that the house had a history of water intrusion; and that, had he been informed that water intrusion had occurred at the house, he would have either conducted a moisture test or declined to perform the inspection.

¶ 13    On 21 July 2014, Ms. Rudd-Gaglie e-mailed the inspection report to plaintiffs, stating that Mr. Williams had told her that, while the issues that needed to be addressed included "mostly small items," "the bigger items were the doors and windows." Ms. Rudd-Gaglie advised plaintiffs to "look over the report" and then call her to "discuss how [plaintiffs] would like to proceed with repairs." In light of the report, plaintiffs and Berkeley Investors amended the purchase contract to provide that Berkeley Investors would pay $4,500 relating to plaintiffs' "expenses associated with the purchase of the Property," with this amount having been intended, according

to Mr. Cummings, to cover the costs of making the repairs that had been identified in Mr. Williams' report. The sale of the house closed on 15 August 2014.

¶ 14        In November 2014, plaintiffs and various members of their family came to the house for the purpose of celebrating Thanksgiving. At that time, which occurred shortly after a major thunderstorm, plaintiffs observed evidence of significant water intrusion extending approximately fifteen feet into the guest floor ceiling. After cutting away a section of the sheetrock in the wall, Mr. Cummings and his son-in-law discovered the presence of black mold and a large termite nest. Mr. Cummings contacted Ms. Rudd-Gaglie to advise her of this discovery, and she recommended that Mr. Cummings contact Craig Moore, a licensed general contractor, for the purpose of getting him to inspect the house.

¶ 15        On the following morning, Mr. Moore conducted an initial inspection of the house. In his deposition testimony, Mr. Moore stated that, at the time of his initial visit to the house, he had observed that the ocean-side wall on the guest level displayed signs of significant water and termite damage and "massive rot," which he described as a "structural issue." Mr. Moore stated that such problems would "take[ ] quite a while" to develop and that such extensive termite damage "doesn't happen in a couple of days." After removing the interior sheetrock walls, Mr. Moore observed the presence of more extensive water damage and rot and discovered that someone

had shoved newspaper into holes in the wall before caulking over the newspaper-filled holes.

In the aftermath of at least one additional visit to the house, Mr. Moore sent plaintiffs a letter dated 5 December 2014 in which he noted that the house had "many active and substantial leaks, which need to be repaired as quickly as possible"; warned that "[t]he structural integrity of the house is or will be compromised as the combination of active leaks and active termite infestation worsen[s]"; and opined that there appeared to have been some "recent aesthetic repairs made to many of the questionable areas." According to Mr. Moore, the extensive damage to the house that he had discovered showed that, while the house had not been "properly maintained," "work had been done to make the house look better." In addition, Mr. Moore concluded that the "previous damage to the house, wherever it was, was carefully painted and hidden so that the only way to discover that there was an ongoing water-intrusion problem would have been to do extensive intrusion testing into the walls" and opined that anyone performing minor paint and repair work at the house "could [not] have done that work without knowing they were covering up a major problem."

According to Mr. Moore, the conditions that he observed in the house would not have given someone performing a visual inspection any reason to believe that conducting intrusive testing for the presence of moisture would have been appropriate. On the other hand, Mr. Moore also testified that, had he inspected the

house, he would have identified the moisture intrusion problems given that he had been trained to recognize when cosmetic repairs had been performed. For this reason, Mr. Moore had advised plaintiffs that they should always have a general contractor, rather than a home inspector, perform any needed home inspections. Plaintiffs paid Mr. Moore in excess of $300,000 to repair the damage that the house had sustained.

**B. Procedural History**

On 2 September 2015, plaintiffs filed a complaint asserting certain claims arising from their purchase of the house. After obtaining leave of court, plaintiffs filed an amended complaint on 12 September 2016 in which they asserted claims for (1) negligence against Re/Max, Mr. Carroll, Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman; (2) negligent misrepresentation against all defendants; (3) breach of fiduciary duty against Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman; (4) unfair and deceptive trade practices, pursuant to N.C.G.S. § 75-1.1 et seq., against Berkeley Investors, Mr. Bell, Re/Max, and Mr. Carroll; (5) breach of contract against Berkeley Investors and Mr. Bell; (6) breach of the implied covenant of good faith and fair dealing against Berkeley Investors and Mr. Bell; (7) fraud and fraud in the inducement against Berkeley Investors, Mr. Bell, Re/Max, and Mr. Carroll; (8) fraud by concealment against Berkeley Investors, Mr. Bell, Re/Max, and Mr. Carroll; and

(9) personal liability against Mr. Bell.[2] In essence, plaintiffs alleged that defendants had induced them to purchase the house in spite of its damaged condition, with the damage having resulted from, among other things, undisclosed water-intrusion problems and termite infestation, and sought to recover compensatory damages related to the costs that they had incurred in repairing the house, treble damages pursuant to N.C.G.S. §75-1.1 et seq., and punitive damages.

¶ 19    On 18 October 2016, 14 November 2016, and 30 November 2016, defendants filed responsive pleadings in which they denied the material allegations of the amended complaint, asserted various defenses, and sought the dismissal of the amended complaint. On 24 and 31 May 2018, defendants filed motions seeking the entry of summary judgment in their favor. Defendants' summary judgment motions were heard before the trial court at the 11 June 2018 civil session of Superior Court, Brunswick County. On 31 July 2018, the trial court entered an order granting defendants' motions for summary judgment in their entirety. Plaintiffs noted an appeal to the Court of Appeals from the trial court's order.

**C. Court of Appeals Decision**

---

[2] Although plaintiffs asserted claims against defendants Thornley Holdings, LLC; David H. Roos; Margaret N. Singer; and Ms. Durham in their amended complaint, they voluntarily dismissed those claims prior to the entry of the trial court's summary judgment order. As a result, we will refrain from discussing plaintiffs' claims against these additional defendants in this opinion.

In seeking relief from the trial court's order before the Court of Appeals, plaintiffs argued that the trial court had erred by granting summary judgment in favor of all defendants. After affirming the trial court's decision to grant summary judgment in defendants' favor with respect to plaintiffs' claims for (1) negligence against Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman; (2) negligent misrepresentation against Rudd & Associates, Ms. Rudd-Gaglie, Mr. Goodman, Re/Max, and Mr. Carroll; (3) unfair and deceptive trade practices against Berkeley Investors, Mr. Bell, Re/Max, and Mr. Carroll; (4) breach of contract against Mr. Bell; (5) breach of the implied covenant of good faith and fair dealing against Berkeley Investors and Mr. Bell; and (6) personal liability against Mr. Bell, the Court of Appeals unanimously reversed the trial court's decision to grant summary judgment in favor of defendants with respect to plaintiffs' claims for negligent misrepresentation and fraud against Berkeley Investors and Mr. Bell. *Cummings v. Carroll*, 270 N.C. App. 204, 235 (2020). Finally, although a majority of the Court of Appeals voted to reverse the trial court's decision to grant summary judgment in favor of defendants with respect to plaintiffs' claims for (1) negligence against Re/Max and Mr. Carroll; (2) fraud and fraud in the inducement against Re/Max and Mr. Carroll; (3) fraud by concealment against Re/Max and Mr. Carroll; and (4) breach of fiduciary duty against Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman, *id*., Judge Arrowood dissented from this aspect of his colleagues' decision. Re/Max, Mr.

Carroll, Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman noted an appeal to this Court from the Court of Appeals' decision based upon Judge Arrowood's dissent. This Court allowed a petition for discretionary review with respect to additional issues filed by Berkeley Investors and Mr. Bell on 18 December 2020.[3]

## II.    Substantive Legal Analysis

### A. Standard of Review

This Court reviews decisions arising from trial court orders granting or denying motions for summary judgment using a de novo standard of review. *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367 (2014). The entry of an order granting summary judgment in favor of a particular party is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1; Rule 56(c) (2019). In evaluating the appropriateness of a trial court's decision to grant or deny a summary judgment motion in a particular case, "we view the pleadings and all other evidence in the record in the light most favorable to the nonmovant and draw all reasonable inferences in that party's favor." *N.C. Farm Bureau Mut. Ins. Co. v.*

---

[3] As a result of the fact that plaintiffs have not sought review of the Court of Appeals' decision to affirm the trial court's decision to grant summary judgment in favor of defendants with respect to certain claims that were asserted in their amended complaint, we will not consider the correctness of the relevant aspects of the Court of Appeals' decision in this opinion.

*Sadler*, 365 N.C. 178, 182 (2011). Although the party seeking the entry of summary judgment in its favor "bears the burden of establishing that there is no triable issue of material fact," the burden shifts to the nonmoving party to "produce a forecast of evidence demonstrating that the [nonmoving party] will be able to make out at least a prima facie case at trial" in the event that the moving party makes the necessary preliminary showing. *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681–82 (2002) (quoting *Collingwood v. Gen. Elec. Real Est. Equities, Inc.*, 324 N.C. 63, 66 (1989)) (alteration in original).

## B. Economic Loss Rule

¶ 22    As an initial matter, Berkeley Investors and Mr. Bell and Re/Max and Mr. Carroll argue that certain claims that plaintiffs have asserted against them are barred by the economic loss rule.[4] In rejecting this contention, the Court of Appeals held that the economic loss rule did not provide any protection against the claims that plaintiffs had asserted against these defendants because none of the conduct that allegedly underlay those claims implicated the terms of the purchase contract between plaintiffs and Berkeley Investors. *Cummings*, 270 N.C. App. at 219. In addition, the Court of Appeals concluded that Re/Max and Mr. Carroll were not

---

[4] Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman did successfully invoke the economic loss rule in opposition to certain claims that plaintiffs had asserted against them in light of the provisions of the buyer's agency agreement. However, no party has sought or obtained review of the Court of Appeals' decision with respect to these claims before this Court.

entitled to claim the protections of the economic loss rule because they lacked privity of contract with plaintiffs. *Id.* We conclude that the Court of Appeals correctly resolved this issue.

¶ 23 "[T]he economic loss rule bars recovery in tort by a plaintiff against a promisor for his simple failure to perform his contract, even though such failure was due to negligence or lack of skill." *Crescent Univ. City Venture, LLC v. Trussway Mfg., Inc.*, 376 N.C. 54, 58 (2020) (cleaned up); *see also N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 294 N.C. 73, 81 (1978) (observing that, "[o]rdinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor"). In such situations, "[i]t is the law of contract and not the law of negligence which defines the obligations and remedies of the parties," *Boone Ford, Inc. v. IME Scheduler, Inc.*, 262 N.C. App. 169, 174 (2018), with the purpose of the economic loss rule being to prevent "contract law [from] drown[ing] in a sea of tort," *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 866 (1986).

¶ 24 Plaintiffs' remaining claims for negligent misrepresentation and fraud against Berkeley Investors and Mr. Bell and for negligence and fraud against Re/Max and Mr. Carroll center on the alleged failure of those defendants to disclose or adequately repair any defects in the house and upon Berkeley Investors' alleged misrepresentations concerning the condition of the house. Specifically, plaintiffs allege that the relevant defendants failed to disclose the existence of a long history of

water-intrusion issues at the house and unreasonably relied upon Mr. Cribb's assurances that he had fully repaired the problem prior to closing. In our view, the Court of Appeals correctly concluded that none of these allegations rely upon the relevant contractual provisions.

¶ 25 According to Berkeley Investors and Mr. Bell and Re/Max and Mr. Carroll, the disclosure statement upon which these claims rely constitutes a part of the purchase contract, so that claims relating to the disclosure statement implicate contractual duties for purposes of the economic loss rule. In support of this assertion, the relevant defendants direct our attention to N.C.G.S. § 47E-5(a), which authorizes the inclusion of a residential property disclosure statement into a contract for the sale of real estate, and point out that Paragraph 5 of the North Carolina Standard Form 2-T Offer to Purchase and Contract relating to the "Buyer Representations," which was used in this transaction, explicitly incorporates the disclosure statement into the purchase contract.

¶ 26 A careful examination of Standard Form 2-T reveals, however, that the document in question simply acknowledges that "Buyer has received a signed copy of the N.C. Residential Property and Owners' Association Disclosure Statement prior to the signing of this offer." For that reason, the language upon which Berkeley Investors and Mr. Bell and Re/Max and Mr. Carroll rely in support of their economic loss rule arguments represents nothing more than an acknowledgement that the

owner had complied with its obligation to provide a residential disclosure statement to the purchaser without addressing the substance of the disclosure statement. *See* N.C.G.S. § 47E-5 (2019). As the Court of Appeals recognized, the disclosure statement also indicates that purchasers "understand that this is not a warranty by owners or owner's agent," with nothing in the contract serving to make the representations contained in the disclosure statement part of the terms of the purchase contract. Thus, since the substance of the disclosure statement is not incorporated into the purchase contact, it cannot serve as the basis for the application of the economic loss rule in this case.

¶ 27 In seeking to persuade us to reach a contrary conclusion, Berkeley Investors and Mr. Bell and Re/Max and Mr. Carroll point to our statement in *Crescent University City Venture* that:

> [w]hen a plaintiff asserts that the subject matter of a contract has, in its operation or mere existence, caused injury to itself or failed to perform as bargained for, the damages are merely economic, and a purchaser has no right to assert a claim for negligence against the seller . . . for those economic losses under the economic loss rule.

376 N.C. at 62. The principle enunciated in *Crescent University City Venture*, which involved a claim brought by the owner of a tract of real estate and a subcontractor based upon the allegedly negligent construction of a critical component of an apartment complex, does not control in this instance given that the present case arose in the context of a subsequent sale of an existing residence between individuals or

privately held entities that the individual participants controlled rather than in the context of a large commercial real estate transaction in which the rights and responsibilities of the parties were comprehensively controlled by a series of inter-related contracts and sub-contracts.

¶ 28 In its opinion in this case, the Court of Appeals referenced its own decision in *Bradley Woodcraft, Inc v. Bodden*, in which it had held that, "while claims for negligence are barred by the economic loss rule where a valid contract exists between the litigants, claims for fraud are not so barred and, indeed, the law is, in fact, to the contrary: a plaintiff may assert both claims." 251 N.C. App. 27, 34 (2016) (cleaned up). According to Berkeley Investors and Mr. Bell, *Bradley Woodcraft* should not be understood as categorically excluding fraud claims from the reach of the economic loss rule, citing decisions by the United States Court of Appeals in *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998), and *Legacy Data Access, Inc. v. Cadrillion, LLC*, 889 F.3d 158 (4th Cir. 2018), and pointing to the Fourth Circuit's statement in *Legacy Data Access* that "*Bradley Woodcraft* is simply another application of the principle that the economic loss rule does not bar tort claims based on an independent legal duty, which is identifiable and distinct from the contractual duty," *Legacy Data Access, Inc.*, 889 F.3d at 166 (cleaned up).

¶ 29 Aside from the fact that this Court is not bound by the Fourth Circuit's interpretation of North Carolina state law, *State ex rel. Martin v. Preston*, 325 N.C.

438, 449–50 (1989), any decision to adopt the Fourth Circuit's reasoning in *Legacy Data Access* would not change the outcome in this case. As we have already noted, the allegedly tortious conduct at issue in this case cannot have constituted a violation of the purchase contract because the representations set out in the disclosure agreement were not incorporated into that document. As a result, even if the Court of Appeals did categorically exempt fraud claims from the economic loss rule in *Bradley-Woodcraft* and even if *Bradley-Woodcraft* was decided in error, the adoption of such a rule would not preclude the assertion of plaintiffs' fraud and negligent misrepresentation claims against Berkeley Investors and Mr. Bell in this case. As a result, the Court of Appeals did not err by holding that the economic loss rule did not bar the assertion of fraud claims against Berkeley Investors, Mr. Bell, Re/Max, and Mr. Carroll and the negligent misrepresentation claim against Berkeley Investors and Mr. Bell that rests upon the contents of the disclosure statement that was provided to plaintiffs.

¶ 30      Although our conclusion that the disclosure statement was not a term of the purchase contract seems to us to adequately support a decision to affirm the Court of Appeals' decision with respect to this issue, we will take this opportunity to address the privity of contract issue as it relates to Re/Max and Mr. Carroll. The Court of Appeals held that, even if the plaintiffs' negligent misrepresentation and fraud claims against Berkeley Investors and Mr. Bell were barred by the economic loss rule,

Re/Max and Mr. Carroll were not entitled to claim the protections of the economic loss rule because they were not parties to the purchase contract. *Cummings*, 270 N.C. App. at 219. Arguing in reliance upon the Court of Appeals' decision in *Simmons v. Cherry*, 43 N.C. App. 499 (1979), Re/Max and Mr. Carroll assert that, in light of the statements that Mr. Carroll had made and the conduct in which Mr. Carroll had engaged for the purpose of ensuring that the transaction closed during the course of his representation of Berkeley Investors and its owners, Mr. Carroll had bound himself to the terms of the purchase contract and was entitled to the same economic loss rule protections as Berkeley Investors and Mr. Bell. We are not, however, persuaded that, aside from its status as a decision of the Court of Appeals rather than of this Court, *Simmons* should be deemed controlling in this case.

¶ 31        In *Simmons*, the president of a corporation contracted with a real estate appraiser for the purpose of obtaining the performance of a feasibility study. The corporation's president did not, at any point during the transaction, mention any involvement on the part of the corporation and, instead, provided a personal assurance that the appraiser's bill would be paid. *Simmons*, 43 N.C. App. at 499–500. In light of these facts, the Court of Appeals concluded that the record contained sufficient support for a finding that the president had bound himself to the contract. *Id*. at 501. In this case, on the other hand, the record contains no evidence suggesting that Mr. Carroll had similarly bound "himself to performance of the contract and

personal liability therefore." *Id*. As a result, we agree with the Court of Appeals'
determination that Re/Max and Mr. Carroll lacked the privity of contract necessary
to support the invocation of the economic loss rule.

## C. Negligence

Next, we consider the viability of plaintiffs' negligence claims against Re/Max
and Mr. Carroll. In reversing the trial court's decision to grant summary judgment
in defendant's favor with respect to these claims, the Court of Appeals held that the
record disclosed the existence of a genuine issue of material fact concerning the extent
to which Re/Max and Mr. Carroll had a duty to disclose the history of water intrusion
into the house given the equivocal nature of Mr. Cribb's statements about the extent
to which he had repaired the leak that he had been hired to address. *Cummings*, 270
N.C. App. at 218. We agree.

"[U]nder established common law negligence principles, a plaintiff must offer
evidence of four essential elements in order to prevail: duty, breach of duty, proximate
cause, and damages," *Estate of Mullis v. Monroe Oil Co.*, 349 N.C. 196, 201 (1998),
with "[a]ctionable negligence [being] the failure to exercise that degree of care which
a reasonable and prudent person would exercise under similar conditions." *Hart v.
Ivey*, 332 N.C. 299, 305 (1992). In their amended complaint and on appeal to the
Court of Appeals, plaintiffs asserted that Re/Max and Mr. Carroll owed them a
number of legal duties, including the duty to (1) "take all reasonable steps to ascertain

all known and readily available material facts about the condition" of the house; (2) make specific inquiry of the owners, including Berkeley Investors and Mr. Bell, for the purpose of obtaining information relating to facts or circumstances that may materially affect plaintiffs' decision to purchase the house; (3) "take all reasonable steps" to ensure that any prior leaks or water-intrusion problems had been repaired by a licensed professional; and (4) ensure that the disclosure statement was accurate, that the house did not contain any defects and that Re/Max and Mr. Carroll had breached those duties by, among other things, (1) failing to discover and correct any material defects in the house or to disclose the defects to plaintiffs; (2) hiring Mr. Cribb, who was a painter, to fix a suspected leak in the guest level living room; (3) permitting Berkeley Investors to provide a disclosure statement that stated that the house did not have any known defects; and (4) failing to disclose the history of water-intrusion problems at the house.

¶ 34    We have previously held that a real estate broker:

> who makes fraudulent misrepresentations or *who conceals a material fact* when there is a duty to speak to a prospective purchaser in connection with the sale of the principal's property is personally liable to the purchaser notwithstanding that the broker was acting in the capacity of agent for the seller.

*Johnson v. Beverly-Hanks & Assocs., Inc.*, 328 N.C. 202, 210 (1991) (quoting P. Hetrick & J. McLaughlin, *Webster's Real Estate Law in North Carolina* § 132, at 165 (3d ed. 1988)).  Put another way, "[a] broker has a duty not to conceal from the

purchasers any material facts and to make full and open disclosure of all such information." *Id.* According to the Court of Appeals' decision in *Clouse v. Gordon*, a real estate broker's duty to share information with a buyer is limited to "material facts *known to the broker* and to representations made by the broker." 115 N.C. App. 500, 508 (1994) (emphasis added).

¶ 35        Acting in reliance upon *Clouse*, the Court of Appeals rejected plaintiffs' contention that the failure of Re/Max and Mr. Carroll to discover "ascertainable" defects in the house rendered those defendants negligent given that "a seller's agent only has a duty to disclose material facts that are *known to him.*" *Cummings*, 270 N.C. App. at 217 (emphasis added). In addition, the Court of Appeals held that Re/Max and Mr. Carroll "owed [p]laintiffs no duty to ensure that the [h]ouse was in any particular condition at the time of closing" and could not, for that reason, be liable in negligence for any failure to make necessary repairs. *Id.* Finally, the Court of Appeals concluded that Re/Max and Mr. Carroll could not be found negligent based upon the theory that they had provided plaintiffs with the disclosure statement because (1) they did not sign it, (2) the disclosure statement provided that "the representations are made by the owner and not the owner's agent(s) or subagent(s)," and (3) the disclosure statement included representations regarding the actual knowledge possessed by Berkeley Investors. *Id.*

¶ 36    Although the Court of Appeals was correct in reaching all of these conclusions, that fact does not completely resolve the issue of whether Re/Max and Mr. Carroll can be held liable to plaintiffs on the basis of negligence. As we have already noted, a real estate broker must disclose all material facts that he or she knows to the potential buyer, with such "material facts" including those that an agent "knows or should know would reasonably affect the [purchaser's] judgment." *Brown v. Roth*, 133 N.C. App. 52, 55 (1999) (quoting James A. Webster, Jr., *Webster's Real Estate Law in North Carolina* §§ 8–9, at 243 (4th ed. 1994)). In other words, Re/Max and Mr. Carroll had a duty to disclose any fact of which they were aware that might reasonably have impacted plaintiffs' decision to purchase the house.

¶ 37    A careful review of the record discloses the existence of evidence tending to show that Mr. Carroll knew of previous water-intrusion issues at the house and that he had hired Mr. Cribb to, among other things, attempt to locate and repair the source of a leak in the guest-level living room. After completing the required work, Mr. Cribb sent a text message to Mr. Carroll informing Mr. Carroll that he "may have found that leak" and that he "hope[d] that was it." Re/Max and Mr. Carroll point to this communication in arguing that Mr. Carroll "was told that the condition had been repaired" and contend, in reliance upon *Clouse*, in which the Court of Appeals held that a real estate agent could not be held liable for relying upon an opinion provided by a professional surveyor whose survey map failed to indicate that the property was

located in a flood hazard zone, *Clouse*, 115 N.C. App. at 503, 509–10, that Mr. Carroll had reasonably relied upon the assurance that he had received from Mr. Cribb, whom Re/Max and Mr. Carroll describe as an "experienced professional," in failing to disclose the existence of the relevant incident of water intrusion to plaintiffs. In response, plaintiffs challenge the adequacy of Mr. Cribb's professional qualifications and the reasonableness of Mr. Carroll's reliance upon Mr. Cribb's statements given their ambiguous and uncertain nature.

¶ 38 A careful review of the record precludes us from holding that the reasonableness of Mr. Carroll's reliance upon Mr. Cribb's statements has been established as a matter of law. Despite Re/Max and Mr. Carroll's characterization of Mr. Cribb as an "experienced professional," he was a painter and pressure washer rather than a licensed contractor. Moreover, even if one was to accept Mr. Cribb's qualifications as sufficient, the equivocal nature of the statements made in the text messages upon which Re/Max and Mr. Carroll rely raises a genuine issue of material fact concerning the extent to which Mr. Carroll reasonably relied upon those statements in failing to disclose to plaintiffs the existence of this instance of water intrusion into the house. Thus, unlike the situation at issue in *Clouse*, in which the qualifications of the relevant professional and the clarity of that professional's assurances do not appear to have been in question, the same cannot be said of either Mr. Cribb or the statements that he made to Mr. Carroll. *See Clouse*, 115 N.C. App.

at 508–09.  As a result, a rational juror could properly conclude that Mr. Carroll acted unreasonably in relying upon the adequacy of Mr. Cribb's performance in rectifying the problems evidenced by the water intrusion into the house.

¶ 39        Both Re/Max and Mr. Carroll, in their brief, and Judge Arrowood, in his dissenting opinion at the Court of Appeals, argue that the home inspection conducted by Mr. Williams, in which the inspector failed to discover that the house had water-intrusion problems, provided further evidence that Mr. Carroll had reasonably concluded that the water-intrusion issue that Mr. Cribb had been hired to address had been adequately repaired.  *Cummings*, 270 N.C. App. at 238 (Arrowood, J., concurring, in part, and dissenting, in part).  Although a home inspection might, under other circumstances, suffice to preclude a finding of potential liability on the part of the agent representing the seller in a real estate transaction, the record before us in this case, which includes evidence tending to show that Mr. Cribb was primarily hired to repaint, rather than repair, the affected area; that the damage to the home was extensive and longstanding; that Mr. Moore testified that efforts had been made to conceal the extent of the water intrusion that had occurred at the home, that the nature and extent of the damage to the house was not immediately apparent, and that there was no reason for either Mr. Williams or plaintiffs to have conducted further investigation in light of that fact coupled with the fact that Mr. Williams testified that he did not find any evidence of water intrusion or moisture damage that

would have prompted him to conduct moisture testing, precludes such a result in this instance. Thus, the results of the inspection performed by Mr. Williams fail to justify a determination that, as a matter of law, the record does not disclose the existence of a genuine issue of material fact relating to plaintiffs' negligence-based claimes resting upon the failure of Re/Max and Mr. Carroll to disclose to plaintiffs the existence of water intrusion into the house.

**D. Negligent Misrepresentation**

¶ 40      The Court of Appeals held, with respect to plaintiffs' claim against Berkeley Investors and Mr. Bell for negligent misrepresentation, that the record disclosed the existence of a genuine issue of material fact concerning whether (1) Berkeley Investors and Mr. Bell reasonably relied upon the work performed by Mr. Cribb and (2) the inspection conducted by Mr. Williams amounted to "reasonable diligence" entitling plaintiffs to rely upon the representations made in the disclosure statement. *Cummings*, 270 N.C. App. at 223–24. We agree.

¶ 41      "The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Dallaire*, 367 N.C. at 369 (quoting *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206 (1988)). However, "[a] party cannot establish justified reliance on an alleged misrepresentation if the party fails to make reasonable inquiry regarding the alleged statement." *Id.* The extent to

which a party justifiably relied upon items of information is generally a question of fact for the jury in the absence of a showing that "the facts are so clear as to permit only one conclusion." *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 225 (1999) (quoting Restatement (Second) of Torts § 552 cmt. e (1977)).

¶ 42       As an initial matter, Berkeley Investors and Mr. Bell argue that they did not make any misrepresentations in the disclosure statement given that, in spite of their knowledge that there had been a leak in the house, they reasonably relied upon the assurances that had been received from Mr. Cribb, as conveyed to them by Mr. Carroll, that the leak had been fixed. In support of this assertion, Berkeley Investors and Mr. Bell direct our attention to the unpublished decision of the Court of Appeals in *Dykes v. Long*, which addressed the issue of whether the seller of a house had fraudulently represented in a disclosure statement that she had no knowledge of defects in a house in spite of the fact that she had previously discovered the existence of cracks in the front porch and had had them repaired by a general contractor. *Dykes v. Long*, No. COA14-148, 2014 WL 2993986, at \*3 (N.C. Ct. App. July 1, 2014) (unpublished). In holding that the sellers' conduct in failing to disclose the crack-related problems of which they were aware did not constitute actionable fraud, the Court of Appeals emphasized that the sellers had taken steps to address the problem, had been assured by the contractor that the problem in question had been rectified, and had observed no further problems with respect to the porch prior to closing. *Id.*

Similarly, Berkeley Investors and Mr. Bell contend that they cannot be held liable to plaintiffs for negligent misrepresentation given that they had received assurances from Mr. Carroll that the leak had been repaired, that Mr. Cribb was fully qualified to repair the leak in light of his extensive experience in performing painting and general repair work, and that no further problems had been observed in the house after the performance of the relevant repair work.

¶ 43        As we have already indicated in addressing the negligence-related claims that plaintiffs have asserted against Re/Max and Mr. Carroll, the record does, in fact, contain evidence tending to show "that [Mr.] Cribb was not qualified to fix the leak in the guest level ceiling," including, but not limited to, the fact that Mr. Cribb was not a licensed contractor and claimed to be engaged in the business of painting and pressure washing, the fact that Mr. Cribb testified that he could not specifically remember having identified and repaired any leaks in the house, and the fact that Mr. Cribb acknowledged that he had not done any work that involved penetrating the interior walls of the house. As a result, aside from the fact that *Dykes* has no precedential value, N.C. R. App. P. 30(4)(3), this case is distinguishable from *Dykes* given the existence of a conflict in the evidence concerning the nature and extent of Mr. Cribb's ability to repair leaks and the fact that, while the problems at issue in *Dykes* did not reappear until sixteen years after performance of the necessary repair work, only a few months had elapsed between the date upon which Mr. Cribb worked

on the house and the plaintiffs' discovery that extensive water-related damage had occurred to that structure. *See Dykes*, 2014 WL 2993986, at *3. As a result, we hold that, when the evidence in the present record is taken in the light most favorable to plaintiffs, it discloses the existence of genuine issues of material fact concerning the reasonableness of Berkeley Investors' and Mr. Bell's reliance upon the repair work that Mr. Cribb performed.

¶ 44 In addition, Berkeley Investors and Mr. Bell argue that, even if they were not entitled to rely upon the repair work performed by Mr. Cribb in preparing the disclosure statement that they delivered to plaintiffs, plaintiffs were not entitled to rely upon the representations made in the disclosure statement given that they had an obligation to perform their own investigation into the condition of the property and failed to do so. In support of this assertion, Berkeley Investors and Mr. Bell direct our attention to *Stevens v. Heller*, in which the Court of Appeals stated that a purchaser of real estate is "not entitled to rely solely on the property disclosure statement prepared by the seller and conduct no independent due diligence . . . unless the buyer can show that the seller's misrepresentations caused the lack of reasonable diligence." 268 N.C. App. 654, 660 (2019).

¶ 45 According to Berkeley Investors and Mr. Bell, plaintiffs should have been aware of the need to conduct a further investigation into the condition of the house for a number of reasons, including (1) the presence of language in the disclosure

statement disclaiming any warranties and recommending that plaintiffs retain a licensed home inspector; (2) the existence of language in the purchase contract indicating that the house was being sold in its "current condition" and disclaiming all warranties; (3) the fact that Mr. Williams noted the need to seal areas on the exterior of the house and to rectify problems with windows and doors that would either not open and close or would not seal properly; and (4) the statement in Mr. Williams' report that he had "attempt[ed] to find a leak but sometimes cannot" and his "recommend[ation] that qualified contractors be used" to inspect and repair the problems identified in the report. According to Berkeley Investors and Mr. Bell, this information should have prompted plaintiffs to request that Mr. Williams conduct additional testing for the presence of moisture and rendered plaintiffs' reliance upon the representations contained in the disclosure statement unreasonable as a matter of law.

¶ 46    In light of the fact-intensive nature of the relevant inquiry, "[t]he reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion." *Forbis v. Neal*, 361 N.C. 519, 527 (2007). Unlike the plaintiffs in *Stevens*, who failed to conduct any inspection of the relevant property prior to the closing, 268 N.C. App. at 656, plaintiffs hired a licensed home inspector and general contractor for the purpose of performing a home inspection. As a result, the operative question for the purpose of this case is whether obtaining the

performance of the inspection conducted by Mr. Williams constituted "reasonable diligence" on the part of plaintiffs or whether plaintiffs should have obtained additional inspections, including the performance of more intrusive moisture testing.

¶ 47      According to Mr. Williams, the absence of any visual evidence tending to suggest the existence of a moisture problem with the house rendered the performance of intrusive moisture testing unnecessary, a determination that Mr. Moore characterized as reasonable.  In addition, as the majority at the Court of Appeals observed, the "alleged efforts [by Berkeley Investors and Mr. Bell] to conceal the water-intrusion issues might have caused [p]laintiffs to forego moisture testing and more reasonably rely upon the [d]isclosure [s]tatement where [p]laintiffs otherwise might not have." *Cummings*, 270 N.C. App. at 224.  As a result, the record contains ample evidence tending to show that plaintiffs reasonably relied upon Mr. Williams' inspection report.

¶ 48      In seeking to persuade us to reach a different result, Berkeley Investors and Mr. Bell, along with the dissenting opinion at the Court of Appeals, emphasize the problems with the house that Mr. Williams identified in his report, including (1) the presence of minor roof damage; (2) the need to seal certain locations on the exterior of the house for the purpose of excluding water and insects; (3) the existence of doors that failed to either close or seal property; (4) the presence of windows that exhibited rust stains and would not open; and (5) the existence of minor leaks that could lead

to the development of mold and the recommendation that Mr. Williams made at numerous locations in his report that "qualified contractors be used in your further inspection or repair issues as it relates to the comments in this inspection report." However, we do not believe that any of this information would have necessarily put plaintiffs on notice that the house might have a serious water-intrusion problem. For example, the reference in the inspection report to leaks "causing mold to grow" involved a condensation line that drained under the house, with mold having developed on the concrete foundation, rather than anything relating to the structure's walls. Similarly, in discussing the areas on the exterior of the house that needed sealing, Mr. Williams stated that "a handy-man can easily make these repairs," a comment that could reasonably be interpreted to suggest that a more in-depth inspection of these areas was not required. In addition, none of the problems mentioned in Mr. Williams' report appear to have been related to either any repair work that Mr. Cribb performed or the extensive water damage problem that Mr. Moore identified. Finally, the recommendation that qualified contractors be used for further inspection and repair work, aside from appearing to be generically applicable "boilerplate" language rather than a recommendation that plaintiffs take any particular action, relates to "the comments in this inspection report," none of which pertained to moisture intrusion into the walls of the house or the need for further testing of the house for its presence.

¶ 49        In addition, Berkeley Investors and Mr. Bell, along with the dissenting opinion at the Court of Appeals, rely upon *MacFadden v. Louf*, in which the Court of Appeals held that a home buyer could not reasonably rely upon alleged misrepresentations contained in a disclosure statement "because [the buyer] conducted a home inspection before closing and that inspection report put her on notice of potential problems with the home." 182 N.C. App. 745, 748 (2007). *MacFadden* is distinguishable from this case, however, given that the inspection report at issue there specifically instructed the plaintiff to hire a roofing contractor in light of the existence of extensive evidence tending to suggest that a potential for water to pond existed, with this evidence including the presence of stains on the chimney and in the attic area; the fact that the floor sagged, deflected, and was uneven; and the fact that other evidence of moisture and pest infestation was present. *Id*. As we have already noted, the report that Mr. Williams prepared concerning the house that is at issue in this case made only generalized comments about the need for further inspections and did not suggest that any significant amount of water intrusion had occurred.

¶ 50        Admittedly, plaintiffs could have engaged in additional investigative activities, including requesting Oak Island Accommodations' maintenance records or having more intrusive moisture testing performed. On the basis of the present record, however, the extent to which plaintiffs' failure to take such additional steps constituted a failure to exercise "reasonable diligence" is a question of fact for the jury

rather than a question of law for the Court. As a result, after viewing the record evidence in the light most favorable to the plaintiffs, we hold that there are genuine issues of material fact concerning the extent to which Berkeley Investors and Mr. Bell reasonably relied upon Mr. Cribb's repair work in representing in the disclosure statement that they did not know of the existence of any water-intrusion problems and the extent to which plaintiffs reasonably relied upon these statements in light of the inspection performed by Mr. Williams.

**E. Fraud**

¶ 51    According to the Court of Appeals, the record also disclosed the existence of genuine issues of material fact concerning the extent to which Berkeley Investors and Mr. Bell defrauded plaintiffs by providing them with a disclosure statement that contained untruthful information concerning the condition of the house and whether Berkeley Investors, Mr. Bell, Re/Max and Mr. Carroll defrauded plaintiffs by failing to disclose the existence of the history of water-intrusion problems at the house and the nature and extent of the steps that had been taken for the purpose of addressing those problems.[5] *Cummings*, 270 N.C. App. at 233–34. Once again, we conclude that the Court of Appeals reached the correct decision with respect to this issue.

---

[5] Although plaintiffs identified Mr. Carroll's assertion that he would buy the house as evidence of fraud, the Court of Appeals concluded that this statement constituted "mere puffing" rather than actionable fraud, having reached this result in reliance upon *Rowan County Board of Education v. United States Gypsum Co.*, 332 N.C. 1, 17 (1992). Plaintiffs

¶ 52    As an initial matter, plaintiffs asserted separate claims for "fraud and fraud in the inducement" and "fraud by concealment" in their amended complaint. The Court of Appeals concluded that, "[b]ecause: (1) the purportedly distinct causes of action each allege false representations or omissions in inducing [p]laintiffs to purchase the [h]ouse; and (2) the respective elements of fraud, fraud in the inducement, and fraudulent concealment overlap on these facts," it would analyze plaintiffs' fraud claims "as separate theories of a single cause of action alleging fraud in the inducement." *Cummings*, 270 N.C. App. at 229. We conclude that the approach adopted by the Court of Appeals with respect to this issue was a reasonable one and will adopt it as our own.

¶ 53    As we have previously stated, "[f]raud has no all-embracing definition"; instead, as a general proposition, fraud "may be said to embrace all acts, omissions, and concealments involving a breach of legal or equitable duty and resulting in damage to another, or the taking of undue or unconscientious advantage of another." *Vail v. Vail*, 233 N.C. 109, 113 (1951) (cleaned up). The following essential elements of actionable fraud are well established: "(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Forbis*,

did not seek further review of this aspect of the Court of Appeals' decision by this Court, which renders it final for purposes of further proceedings in this case. *See* N.C. R. App. P. 28(b)(6).

361 N.C. at 526–27 (quoting *Ragsdale v. Kennedy*, 286 N.C. 130, 138 (1974)). On the

other hand, "any reliance on the allegedly false representations must be reasonable."

*Id*. at 527 (citing *Johnson v. Owens*, 263 N.C. 754, 757 (1965)).

¶ 54          Berkeley Investors, Mr. Bell, Re/Max, and Mr. Carroll argue that they are not

liable for fraud for the same essential reasons that cause them to contend that a

finding of liability on the basis of negligence would be inappropriate. Berkeley

Investors and Mr. Bell insist that (1) neither the record nor the applicable law provide

any support for a finding that they knowingly made a false statement in the

disclosure statement and that (2), even if they made such a statement, plaintiffs

cannot show that they reasonably relied upon the alleged misrepresentations. More

specifically, Berkeley Investors and Mr. Bell assert that Mr. Carroll, who represented

them in the relevant transaction, had no obligation to inform plaintiffs of the

existence of the leak that had been repaired by Mr. Cribb given Mr. Cribb's

assurances that the leak had been successfully remediated and that it was reasonable

for everyone involved to rely upon Mr. Cribb's professional judgment. In addition,

Berkeley Investors and Mr. Bell argue that plaintiffs could not reasonably rely on the

representations made in the disclosure statement given their failure to heed the

recommendations set out in that document, the purchase contract, and Mr. Williams'

report that they obtain additional inspections of the house. Similarly, Re/Max and

Mr. Carroll contend that Mr. Carroll "did not have a duty to disclose the condition of

the repaired leak because he justifiably relied on [Mr. Cribb's] representations that the leak was repaired and believed (also based on months of observation and the findings of other professionals) the leak to be repaired." In their view, plaintiffs could not prove that Berkeley Investors, Mr. Bell, Re/Max, or Mr. Carroll knew of the existence of any problems that had not been reported in the disclosure statement, with plaintiffs having been put on notice of the existence of additional potential problems that they failed to adequately investigate.

¶ 55 We are unable, for the reasons set forth above, to accept the validity of any of these arguments. In our view, as the Court of Appeals correctly determined, the record discloses the existence of genuine issues of material fact concerning (1) the reasonableness of any reliance that Berkeley Investors, Mr. Bell, Re/Max, and Mr. Carroll may have placed upon the repair work performed by Mr. Cribb and (2) whether plaintiffs reasonably relied upon the inspection report prepared by Mr. Williams. Although we have focused much of our discussion of this issue upon the reasonableness of the reliance placed by Berkeley Investors, Mr. Bell, Re/Max, and Mr. Carroll upon the repair work performed by Mr. Cribb and the reliance placed upon Mr. Williams' report by plaintiffs, we have not lost sight of the fact that the record contains evidence tending to show that significant water intrusion had occurred in the past and that Berkeley Investors and Mr. Bell knew of the existence of this condition. After acknowledging that the maintenance records maintained by

Oak Island Accommodations showed that water intrusion had occurred at the house in the past, Berkeley Investors, Mr. Bell, Re/Max, and Mr. Carroll insist that the records "also show that each and every issue was addressed and resolved" and that plaintiffs had failed to request that they be provided with the relevant maintenance records in spite of the fact that they knew of their existence. We agree, for the reasons stated below, that none of defendants had a legal duty to obtain the Oak Island Accommodations maintenance records and to provide them to plaintiffs. We also conclude, however, that the existence of these records, coupled with the e-mails exchanged between Mr. Bell, Mr. Carroll, and Ms. Durham concerning water-intrusion problems at the house over the course of nearly a year prior to the closing, provide additional support for our conclusion that the record discloses the existence of a genuine issue of material fact concerning the validity of plaintiffs' fraud claims given that awareness of the existence of these problems tends to undercut the accuracy of the representations contained in the disclosure statement concerning the condition of the house.

¶ 56    We are not, obviously, holding that these facts compel a finding of liability or that a jury would not be able, depending upon its evaluation of the evidence, to return a verdict in favor of Berkeley Investors, Mr. Bell, Re/Max, and Mr. Carroll or that either sellers or real estate agents owe a fiduciary duty to buyers or to disclose defects that do not exist. Instead, we are simply holding that, in light of the present record,

a reasonable jury could, but was not required, to find in plaintiffs' favor with respect to these fraud-related claims. As a result, for all of these reasons, we hold that the Court of Appeals correctly held that the trial court had erred by entering summary judgment in defendants' favor with respect to the fraud claims that plaintiffs had asserted against Berkeley Investors, Mr. Bell, Re/Max, and Mr. Carroll.

**F. Inference Running Backwards**

¶ 57        Finally, Berkeley Investors and Mr. Bell argue that the Court of Appeals erred in reversing the trial court's summary judgment order by violating the prohibition against relying upon inferences that "r[a]n backward." In support of this argument, Berkeley Investors and Mr. Bell direct our attention to our decision in *Childress v. Nordman*, which they claim enunciates a "general rule that mere proof of the existence of a condition or state of facts at a given time does not raise an inference or presumption that the same condition or state of facts existed on a former occasion." 238 N.C. 708, 712 (1953). In light of this principle, Berkeley Investors and Mr. Bell argue that the Court of Appeals erred by relying upon Mr. Moore's testimony, which rested upon an inspection of the house that he conducted three months after the closing, given the absence of any "evidence before the Court of Appeals sufficient to show that [the] representations concerning the [h]ouse's condition [made by Berkeley Investors and Mr. Bell] were false either when made by them or when acted on by

[plaintiffs]—despite [Mr.] Moore's opinion . . . that the problems had been 'going on for quite some time.' "

¶ 58 As Berkeley Investors and Mr. Bell have conceded, however, subsequent decisions of this Court and the Court of Appeals have held that the principle articulated in *Childress* was "not of universal application" and that its application was, instead, dependent upon the "facts and circumstances of the individual case, and on the likelihood of intervening circumstances as the true origin of the present existence or the existence at a given time," *Jenkins v. Hawthorne*, 269 N.C. 672, 674–75 (1967) (cleaned up) (holding that a reasonable jury could infer from evidence that the house at issue in that case was in the same condition at the time that the defendant made her allegedly false representations as it was when the problems were discovered several months later), with this Court having stated in *Jenkins* that "so much depends upon circumstances that it seems a mistake to think in terms of a 'rule' with respect to this or any other of the many factors that must be considered," *id.* at 675 (quoting Stansbury, N.C. Evidence § 90 (2d ed. 1963)), and with the Court of Appeals having described the *Childress* "rule" as being "riddled with exceptions" and having stated that "[t]he trend is toward permitting the fact finder to consider the subsequent condition or fact along with all of the surrounding circumstances in arriving at its conclusion as to the existence of the condition or fact at the relevant time," *Plow v. Bug Man Exterminators, Inc.*, 57 N.C. App. 159, 162 (1982). A careful

examination of the record that is before us in the present case satisfies us that a reasonable jury could determine, based upon Mr. Moore's testimony, that the damage that he discovered had been in existence at the time of closing, particularly given the emphasis that Berkeley Investors and Mr. Bell have placed upon Mr. Cribb's repair work and the absence of any evidence tending to show that any event that might have caused the damage that Mr. Moore observed had occurred between August and November 2014. As a result, we hold that the Court of Appeals did not violate any rule against "inferences running backwards" in partially reversing the trial court's summary judgment order.

**G. Breach of Fiduciary Duty**

¶ 59      Finally, in addressing the validity of the Court of Appeals' determination that the record disclosed the existence of genuine issues of material fact concerning the extent to which Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman breached a fiduciary duty to plaintiffs by (1) failing to procure the Oak Island Accommodations maintenance records on behalf of plaintiffs and (2) hiring Mr. Williams to inspect the house given his failure to conduct intrusive moisture testing, we begin by noting that the relationship between a real estate agent and his or her client is by, definition, one of agency, with the agent owing a fiduciary duty to the buyer in all matters relating to the relevant transaction. *See* Restatement (Third) of Agency § 8.01 (2006). More specifically:

> A real estate agent has the fiduciary duty to exercise reasonable care, skill, and diligence in the transaction of business entrusted to him, and he will be responsible to his principal for any loss resulting from his negligence in failing to do so. The care and skill required is that generally possessed and exercised by persons engaged in the same business. This duty requires the agent to make a full and truthful disclosure to the principal of all facts known to him, or discoverable with reasonable diligence and likely to affect the principal. The principal has the right to rely on his agent's statements, and is not required to make his own investigation.

*Brown*, 133 N.C. App. at 54–55 (cleaned up). In the same vein, the North Carolina Real Estate Manual, which is published by the North Carolina Real Estate Commission, notes that real estate agents have a duty to disclose any material facts known to the agent and to "discover and disclose to the principal all material facts about which the agent *should reasonably have known*." *N.C. Real Est. Manual* 209 (Patrick K. Hetrick, Larry A. Outlaw & Patricia A. Moylan, eds., 2013) (emphasis omitted).

In arguing that they did not breach any fiduciary duty that they owed to plaintiffs, Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman claim that the duties that they owed to plaintiffs were "define[d]" by the Exclusive Buyer Agency Agreement, which provided, in pertinent part, that Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman had a duty to "disclos[e] to [plaintiffs] all material facts related to the property or concerning the transaction of which [they] ha[d] actual knowledge"; advised plaintiffs to "seek other professional advice in matters of . . .

surveying, wood-destroying insect infestation, structural soundness, engineering, and other matters"; and warned plaintiffs that, while Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman "may provide [plaintiffs] the names of providers who claim to perform such services, [plaintiffs] understand[ ] that [Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman] cannot guarantee the quality of service or level of expertise of any such provider." Finally, the agency agreement provided that plaintiffs would "indemnify and hold [Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman] harmless" from any claims or liability arising from plaintiffs' selection of any such service provider or their decision not to have a particular service performed.

¶ 61        As the Court of Appeals correctly held, "a real-estate agent's fiduciary duty is not prescribed by contract, but is instead imposed by operation of law." *Cummings*, 270, N.C. App. at 225. The fiduciary duty that a real estate agent owes to his or her principal arises from the agency relationship itself, *Raleigh Real Est. & Tr. Co. v. Adams*, 145 N.C. 161 (1907), with the duties that flow from that relationship being dependent upon the level of skill, knowledge, and professional practices in accordance with which real estate professionals generally operate rather than upon the nature of the contractual provisions governing any specific agent-principal relationship. *See* Restatement (Third) of Agency § 8.08 cmt. c (2006); *see also Firemen's Mut. Ins. Co. v. High Point Sprinkler Co.*, 266 N.C. 134, 142 (1966) (observing that, when a professional undertakes to represent a principal, he or she "implies that he [or she]

possesses the degree of professional learning, skill and ability which others of that profession ordinarily possess, he [or she] will exercise reasonable care in the use of his [or her] skill and application of his [or her] knowledge to the assignment undertaken, and will exercise his [or her] best judgment in the performance of the undertaking"). Rudd & Associates, Ms. Rudd-Gagle, and Mr. Goodman have failed to cite any authority for the proposition that a real estate agent may limit or "define" his or her fiduciary duties by contract, and we know of none. As a result, we decline to hold that the extent of the duties that Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman owed to plaintiffs in connection with the transaction that is at issue in this case hinged upon the language of the agency agreement rather than upon general principles of North Carolina agency law.[6]

¶ 62    As we have already noted, the relevant Real Estate Commission guidelines indicate that a real estate agent is obligated to "*discover and disclose*" those material facts that "may affect [plaintiffs'] rights and interests or influence [plaintiffs'] decision in the transaction" rather than to simply disclose those of which the agent has "actual knowledge." *N.C. Real Est. Manual* 209, 211. In view of the fact that plaintiffs do not contend that Rudd & Associates, Ms. Rudd-Gaglie, or Mr. Goodman had actual

---

[6] Although Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman contend that, rather than "restrict[ing] or limit[ing their] fiduciary duty," the Exclusive Buyer Agency Agreement simply "defines that duty," this distinction strikes us as without legal effect to the extent that it defines the duties that Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman owed to plaintiffs as something less than what would otherwise be required by law.

knowledge of the water-intrusion problems that existed at the house, the relevant issue with respect to plaintiffs' breach of fiduciary duty claim against Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman is whether the record discloses the existence of a genuine issue concerning the extent to which Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman exercised a level of diligence consistent with applicable professional standards. *See Brown*, 133 N.C. App. at 54.

¶ 63     In attempting to persuade this Court that the record does not contain any evidence tending to suggest that they failed to meet the applicable standard, Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman begin by arguing that plaintiffs failed to adduce evidence tending to show that they had an affirmative duty to obtain the relevant Oak Island Accommodations maintenance records or that it was "customary or necessary" for them to do so. In support of this argument, Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman point out that, unlike the situation at issue in *Brown*, in which a specific Real Estate Commission guideline required the agent to make his or her own measurement of the square footage of the property rather than relying upon the measurements provided by an appraiser, no guideline requires an agent to procure prior maintenance records in the event that the house in question had previously been used as a rental property. In addition, Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman emphasize that Ms. Rudd-Gaglie obtained all of the

information that plaintiffs requested, with plaintiffs having failed to ask them to obtain the relevant maintenance records.

¶ 64        In rejecting these arguments, the Court of Appeals concluded that, since Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman had failed to cite any authority for the proposition that "a real-estate agent's duty to investigate and disclose is limited, as a matter of law, by the [ ] Real Estate Commission [or] the requests made by the agent's client," *Cummings*, 270 N.C. App. at 226, the record disclosed the existence of a genuine issue of material fact concerning the extent to which Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman had a duty to obtain the Oak Island Accommodations maintenance records and provide them to plaintiffs. In our view, however, the question that the Court of Appeals should have addressed is whether the Oak Island Accommodations maintenance records encompassed material information and, if so, whether Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman had an independent duty to request these records in their exercise of "reasonable diligence." *Brown*, 133 N.C. App. at 55.

¶ 65        The only evidence that plaintiffs cite in support of their contention that Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman had an independent duty to obtain the relevant maintenance records is the deposition testimony of Walter LaRoque, a real estate agent who served as an expert witness for Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman. Although Mr. LaRoque acknowledged that the extent to

which particular facts are material can be buyer-specific and that Ms. Rudd-Gaglie had an obligation to conduct an independent investigation into the condition of the property, he never stated that the Oak Island Accommodations maintenance records constituted material information for purposes of this transaction or that Ms. Rudd-Gaglie had an independent duty to request them. On the contrary, while it is clear from an analysis of his deposition testimony that Mr. LaRoque believed that the *cost* of maintaining the house would be a material fact given the impact that such information would have had upon the viability of the house as rental property, he did not, as best we can ascertain, testify that Ms. Rudd-Gaglie had an affirmative obligation to make an independent request for the relevant maintenance records themselves. In the absence of such evidence, we hold that the record does not reveal the existence of a disputed issue of material fact with respect to this issue and that Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman are entitled to judgment as a matter of law with respect to the issue of whether they breached their fiduciary duty to plaintiffs by failing to obtain the relevant Oak Island Accommodations maintenance records.

¶ 66     Secondly, Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman contend that they fulfilled their fiduciary duty to plaintiffs by recommending that Mr. Williams, who was a licensed home inspector, inspect the house and emphasize that, despite plaintiffs' contention before the Court of Appeals that the performance of

moisture testing was a "usual and customary" component of a home inspection, Mr. Williams had testified that he only performed intrusive moisture testing when he concluded that it was necessary to do so and that they reasonably relied upon his determination that there was no need for him to conduct such testing in this case.[7] In addition, Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman point to Mr. Moore's testimony that there was no reason for Mr. Williams to have performed such moisture testing given the absence of readily apparent water damage.

¶ 67    In rejecting this aspect of the position espoused by Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman, the Court of Appeals pointed to Mr. Moore's testimony that *he* would have identified the water-intrusion problem has he inspected the property and the lack of clarity concerning the extent to which the performance of a moisture test was a "usual and customary" component of a home inspection before stating that it was "unable to conclude that [Mr.] Williams' failure to conduct such a test was unobjectionable." *Cummings*, 270 N.C. App. at 226–27. However, the undisputed record evidence tends to show that Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman recommended Mr. Williams on the basis of his expertise in detecting moisture-related problems, that neither Ms. Rudd-Gaglie nor Mr. Goodman were licensed home inspectors or general contractors and did not know what the

---

[7] Although plaintiffs emphasize the results of Mr. Williams' inspection in the factual statements set out in their brief, they do not mention it in discussing their breach of fiduciary duty claim against Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman.

components of a proper home inspection would be, and that, at the time of his employment, Mr. Williams was a licensed home inspector, general contractor, and insurance adjuster who had never been subject to any sort of professional discipline. In addition, Mr. Moore corroborated Mr. Williams' contention that there was no reason, based upon what he had seen while inspecting the house, for the performance of additional moisture testing given that the water damage that the house had sustained was not readily apparent in light of the cosmetic repairs that had been made. As a result of the fact that plaintiffs did not successfully impeach Mr. Williams' qualifications or demonstrate that Rudd & Associates, Ms. Rudd-Gaglie, or Mr. Goodman had any reason to conclude that Mr. Williams had failed to act in an appropriate manner, the record contains no basis for concluding that Rudd & Associates, Ms. Rudd-Gaglie, or Mr. Goodman failed to exercise "reasonable diligence" in recommending that plaintiffs employ Mr. Williams or in relying upon his expertise.[8] *See Clouse*, 115 N.C. App. at 509 (holding that a real estate agent reasonably relied upon the expert opinion of an independent surveyor). As a result, we hold that the Court of Appeals erred by reversing the trial court's decision to grant

---

[8] Although plaintiffs have argued that the performance of a moisture test was "usual and customary" and that Mr. Williams had failed to perform such a test, it seems to us that such an argument tends to support a claim against Mr. Williams relating to the manner in which he conducted his inspection rather than a claim for breach of fiduciary duty against Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman.

summary judgment in favor of Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman with respect to this issue.

### III.    Conclusion

¶ 68        Thus, for the reasons set forth above, we hold that the Court of Appeals correctly determined that the trial court had erred by granting summary judgment in defendants' favor with respect to plaintiffs' claims for negligence and fraud against Re/Max and Mr. Carroll and for negligent misrepresentation and fraud against Berkeley Investors and Mr. Bell and that the Court of Appeals erred by reversing the trial court's decision to grant summary judgment in favor of Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman.    As a result, the Court of Appeals' decision is affirmed, in part, and reversed, in part, with this case being remanded to the Court of Appeals for further remand to Superior Court, Brunswick County, for a trial on the merits with respect to plaintiffs' remaining claims against Berkeley Investors, Mr. Bell, Re/Max, and Mr. Carroll and for the dismissal of the entirety of their claims against Rudd & Associates, Ms. Rudd-Gaglie, and Mr. Goodman.

AFFIRMED, IN PART; REVERSED, IN PART; AND REMANDED.

Justice BERGER concurring in part and dissenting in part.

I concur with the portion of the majority opinion that reverses the Court of Appeals' decision regarding plaintiffs' agents and claims of negligent misrepresentation and fraud against the sellers. For the reasons below, however, I respectfully dissent from the majority opinion addressing the claims of negligence and fraud against the sellers' agents.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . any party is entitled to a judgment as a matter of law." *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367 (2014). To be a "genuine issue" for purposes of summary judgment, an issue must be "maintained by substantial evidence." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534 (1971).

The duties owed by real estate agents are well settled in this state.

> A real estate agent has the fiduciary duty to exercise reasonable care, skill, and diligence in the transaction of business entrusted to him, and he will be responsible *to his principal* for any loss resulting from his negligence in failing to do so. The care and skill required is that generally possessed and exercised by persons engaged in the same business. This duty requires the agent to make a full and truthful disclosure to the principal of all facts known to him, or discoverable with reasonable diligence and likely to affect the principal.

*Brown v. Roth*, 133 N.C. App. 52, 54–55 (1999) (cleaned up) (emphasis added).

In addition to the fiduciary duties owed by agents to their principals, real

estate agents also owe duties to third parties. Specifically, "[a] broker has a duty not to conceal from the purchasers any material facts and to make full and open disclosure of all such information." *Johnson v. Beverly-Hanks & Assocs., Inc.*, 328 N.C. 202, 210 (1991) (citing *Spence v. Spaulding & Perkins, Ltd.*, 82 N.C. App. 665 (1986)). This duty arises from N.C.G.S. § 93A-6(a), which states that the North Carolina Real Estate Commission (the Commission) has the authority to discipline a broker for "[m]aking any willful or negligent misrepresentation or any willful or negligent omission of material fact." N.C.G.S. § 93A-6(a) (2019). "Material fact" is defined in the Commission's Student Manual generally as "[a]ny fact that could affect a reasonable person's decision to buy, sell, or lease" the property in question. 2019–2020 General Update Course, Student Manual 28 (N.C. Real Est. Comm'n, 2019), https://www.superiorschoolnc.com/wp-content/uploads/2020/03/2019-20-General-Update-version-9.2019.pdf. More specifically, when the fact in question involves the condition of the property itself, as in the present case, the manual describes a material fact as follows: "significant property defects or abnormalities such as[ ] structural defect(s), malfunctioning system(s), [a] leaking roof, or drainage or flooding problem(s)." *Id.* Where a defective condition is repaired, the prior defect need not be disclosed because the condition is no longer "material."

¶ 73    Here, the majority agrees with plaintiffs' contention that (1) the adequacy of Cribb's qualifications and (2) the equivocal nature of his statements to Carroll that

he "may have found the leak" and that he "hope[d] that was it" raise an issue of material fact as to whether Carroll's belief that the leak had been fixed was reasonable. Cribb's qualifications, however, have no bearing on the present analysis. Rather, Carroll's reasonable conclusion that the leak had been fixed was bolstered by the result of plaintiffs' inspection. That inspection, which was conducted by a licensed contractor just three days after it had rained, revealed no evidence of an ongoing leak.

¶ 74      At some time prior to March 24, 2014, Cribb completed several repairs to the exterior of the home in an effort to fix a leak that had stained the ceiling. On July 12, 2014, plaintiffs made an offer to purchase the subject property. Nearly four months after Cribb's repairs, plaintiffs commissioned a property inspection to be conducted by a licensed home inspector on July 19, 2014. Despite the rain that occurred three days before the inspection, the inspector found no evidence of an ongoing leak where the stain had previously been. Carroll was present during the inspection and received a copy of the report. It was not until after a major thunderstorm in November 2014 that further evidence of water intrusion emerged. The relevant record evidence, viewed in the light most favorable to plaintiffs, thus demonstrates that Carroll hired a handyman to repair a leak, the handyman conducted repairs, and four months later, a licensed home inspector found no evidence of an existing leak even after it had recently rained.

¶ 75      Under these circumstances alone, it was reasonable for Carroll to believe that

the leak had been remedied. As such, the fact that there had previously been a leak was no longer "material." *See* 2019–2020 General Update Course, Student Manual 28 (N.C. Real Est. Comm'n, 2019). Carroll was thus under no duty to disclose this information to plaintiffs. Since plaintiffs have failed to forecast sufficient evidence to show that the sellers' agents owed a duty, plaintiffs cannot prevail on their negligence claim. For similar reasons, I would also conclude that the sellers' agents did not commit fraud.

¶ 76 Moreover, the majority expands the duty a seller's agent owes a purchaser to the functional equivalent of a fiduciary duty. The obligations seller's agents owe to purchasers are fairly well established. At least they were. The majority opinion seems to suggest a seller's real estate broker is now a guarantor of the condition of the subject property and faces potential liability for failure to disclose any potential deficiency mentioned by the seller. Inevitably, the expansion of this duty will lead to uncertainty as to the responsibilities of seller's agent to the seller vis à vis this new duty to the buyer.

Chief Justice NEWBY joins in this opinion.